**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | | |
|---|---|---|
| RACHEL ALDRIDGE, as Surviving Mother of Brooklynn Aldridge, Deceased, and as Temporary Administrator of the Estate of Brooklynn Renee Aldridge, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | CIVIL ACTION NO: 5:21-cv-15 |
| BEVERLY BEAUMIER, CLINTON WAYNE HARPER, and RAVEN GOLDEN, | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S PARTIAL MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN SUPPORT THEREOF**

COMES NOW Plaintiff in the above-styled matter, and moves this Court for partial summary judgment on the issue of Defendant Beverly Beaumier's liability, showing as follows:

The Department of Family and Children's Services ("DFCS") continues to defend this case for Defendant Beverly Beaumier. It has defended her behavior since 2019. This case is indefensible. At the same time DFCS and the State of Georgia has denied liability in this case through their appointed counsel for Beaumier, they have admitted Beaumier directly caused the death of Brooklynn Aldridge ("Brooklynn"). Three and a half years after the murder and torturous seven weeks of mental and physical cruelty visited on little Brooklynn by her murderer, Amanda Coleman, it is time for justice.

On July 8, 2021, DFCS admitted through its corporate 30(b)(6) deponent LaResa Price, its Safety Services Director and the subsequent depositions of five current and former DFCS

1

managers that Defendant Beverly Beaumier failed to follow <u>mandatory DFCS protocols and this</u> <u>directly led to Brooklynn Aldridge's death.</u>  It is the purpose of this Motion to have this Court, based on these admissions and Beaumier's own admissions, grant partial summary judgment on the issue of liability.

<div align="center"><u>FACTS</u></div>

This case evolves out of an absolutely preventable murder of an innocent 2 year old little girl, Brooklynn Aldridge ("Brooklynn").  It arises out of the taking of this little girl from her custodial parent, Rachel Aldridge, and placing her in an alien, awful environment for seven weeks prior to her murder.  This murder was caused by her being beaten to death by her DFCS approved caregiver, Amanda Coleman.



The chain of events which led to the murder of Brooklynn began on the evening of January 14, 2018, at Rachel Aldridge's house in Mershon, Georgia. There had been a complaint filed against Austin Aldridge, Rachel Aldridge's son, by her neighbor. Members of the Pierce County Sheriff's Department responded.

At the Aldridge home that evening, when the deputies arrived, were Rachel, three of her

five children, her then-boyfriend and a friend of his. The deputies took Rachel's son, Austin, to juvenile detention. In making this call, the deputies checked the credentials of everyone there. Rachel's search came up with an outstanding warrant for failure to appear at a preliminary hearing in Coffee County. Although these charges would later be dismissed as baseless, Rachel was put in the Pierce County Jail for 2 days.  She was then transferred to the Coffee County Jail the night of January 16th, 2018.  Rachel would spend the next six days there.

When she got out of jail on January 22, 2018, she walked several miles from the jail to Ron Lott's mobile home to pick up Brooklynn.  She was denied access to Brooklynn.  This was despite the fact she was the sole parent with a right to legal custody and, really, the only parent Brooklyn knew. The denial of her rights to custody was based upon a child safety plan which DFCS has conceded was a document improperly drafted and distributed by Beverly Beaumier.

Between January 14th and January 15th 2018, Beaumier wrote a child safety plan up with no input from either the caregiver (Rachel Aldridge) or the safety resource (Ron Lott).  On January 15, 2018, Beverly Beaumier went to the homes of Jimmy and Vanessa Taylor and Ron Lott / Amanda Coleman. The Taylors – the sister and brother-in-law of Rachel – had picked Kaylen and Brandon up at Rachel's house the night before. They wanted to take care of Brooklynn as well. Beaumier refused the requests to have the Taylors take care of Brooklynn on January 15 and again later. Vanessa is a nurse and Jimmy was an ICE agent. (Doc. 84, p. 3). They were certified foster care parents.

Beaumier falsely told Lott at the initial meeting at his mobile home that Rachel was on methamphetamines. Therefore, he agreed to become the safety resource for Brooklynn. At the initial meeting with the Taylors, Beaumier told Rachel's children and the Taylors she was

looking for permanent placement for them. A child safety plan was signed by Vanessa and

Jimmy Taylor for the temporary care of two of Rachel's children with them. No child safety

resource consent agreement or child safety resource brochure was provided to them by Beverly

Beaumier, despite being required by mandatory DFCS protocol (see below).

## NEVER TURNED OVER BY DFCS OR GIVEN TO RACHEL ALDRIDGE

Safety Resource Brochure (Page 2)

### Safety Resource Guide: *Families and neighbors helping keep children safe*

Someone you know is in need of help and has reached out and asked you to assist with the temporary care of a child while they sort things out. This guide answers frequently-asked questions about the roles and responsibilities that you might want to consider in helping your neighbor, friend or relative.

**Why is Family and Children Services involved?**

The Department of Family and Children Services is in receipt of a referral alleging that this family is in need of help. The actual allegations will vary from family to family. Using a safety resource allows everyone involved to ensure the child is in a safe setting, out of the home while DFCS assesses the needs of the child and the family. A child residing in a safety resource is based on a safety plan, which is a voluntary agreement between DFCS, the caregiver, and the safety resource. This not foster care, and the state does not have custody of the child. The child may reside with you for up to 45 days.

**What is expected of me as a safety resource family?**

As a safety resource, you are expected to care for the child while an investigation is in process and until DFCS determines that the home is safe for the child's return. The ground rules for assuring the child's safety are spelled out in the written safety plan, and you should request a copy of it from the case manager and ask any questions you may have about it.

Safety resources must undergo a background check to assure that DFCS is not placing additional stress on your family and to assure you can provide the child with safe care. We will be looking at child care arrangements, criminal histories and past agency involvement among other

factors.

In general, we are looking for safety resource families who can provide a supportive, nurturing environment for children.

To ensure the child can remain safely in your home, you must comply with the safety plan and with the case manager's requests. While our case is still open and the children are in your home, we will visit the children and you to see how things are progressing.

**How long will this go on before the child returns to the family?**

Each family is unique and has its own set of circumstances. Generally speaking, a child should not be in a safety resource setting for more than 45 days. If the family has not worked out all issues within that time, you may want to talk with the case manager and caregivers about making arrangements for longer-term care of the child, including the possibility of obtaining temporary guardianship for the child.

Sometimes, if issues with the child's home are not resolved, DFCS may have to file a complaint in Juvenile Court and ask the court to intervene and make a decision about child safety. You should work closely with the case worker and the caregivers and keep informed of the case's progress.

**What about schools, doctor visits, visitation with parents, and such?**

The caregiver retains legal custody of the child, so you will need to work with the caregiver and the case manager to ensure all parties understand their obligations. The case manager can help you obtain any documents you need to enable you to assist the child with school requirements or obtain medical care for the child.

The case manager will give you his or her contact information as well as information on the child's health needs, medications, health insurance, school, and other items necessary for you to provide temporary care for the child.

**Who pays for all this?**

We expect the caregivers who needed your help to continue to assist in caring for their children financially and emotionally. In the event they cannot, there may be programs that may be able to help you. Ask the case manager where to go in the community to get the help that you need.

**What happens next?**

The case manager responsible for this family will begin the process of evaluating the family's issues and needs. You should consider yourself a valuable part of the team that is trying to assist this family and enable the child to return home as soon as possible. Do not hesitate to ask the case manager questions about the child and about what you can do to help resolve this situation as quickly as possible.

**CAREGIVER - RACHEL ALDRIDGE (MOM)**

**"THE CAREGIVER RETAINS LEGAL CUSTODY OF THE CHILD"**

*Thank you for agreeing to help!*

Helping Keep Children Safe: Your Rights and Responsibilities as a Safety Resource (rev. 2015)

**"Helping Keep Children Safe. Your Rights and Responsbilities as a Safety Resource"**

**"A child residing in a safety resource is based on a safety plan, which is a voluntary agreement between DFCS, the caregiver and the safety resource"**

**"Safety resources must undergo a background check...we will be looking at...criminal histories and past agency involvement among other factors"**

**"To ensure the child can remain safely in your home, you must comply with the safety plan and with the case manager's requests"**

This brochure would have importantly provided Jimmy and Vanessa Taylor with the crucial information that Rachel retained custody of all her children, including Brooklynn, under a child safety plan. Additionally, the child safety resource brochure would have informed the Taylors that deference should have been afforded to Rachel's wishes that, after the first night with Ron Lott, she wanted Brooklynn to stay with the Taylors.

A child safety plan is a voluntary agreement between the child's caregiver, a safety resource and DFCS. Legal custody of the child remains in the caregiver (Rachel Aldridge). The safety resource is there to help out while the caregiver deals with certain short-term problems. These plans last a maximum of 45 days. It is required, under DFCS protocol, that the caregiver and safety resource review and sign a safety resource consent form. This explains the voluntary nature of the plan and the rights of the custodial parent who retains legal custody.

Similar to the situation with the Taylors, this consent form was never presented by Beaumier/DFCS to Rachel. It is required to be signed by Rachel. DFCS admits Beaumier failed to do this. If it had been provided, Brooklynn would have been alive today, as it would have informed both Rachel and Ron Lott that legal custody of Brooklynn remained with Rachel. When Rachel went to pick up Brooklynn, Rachel would have known her rights and asserted them.

A second required document to be provided to both Rachel and Lott, contemporaneous with the review and execution of the child safety plan, was a child safety brochure. Similarly, this would have advised Rachel of her rights. This document was not provided to Rachel or Lott. DFCS admits it was not. Again, if Rachel had been provided the child safety brochure when she went to the Lott mobile home, she would have asserted her custody rights.

The child safety plan given to Ron Lott on January 15, 2018 was already filled out by

5

Beverly Beaumier. DFCS admits this violates its policies. Fraudulently, the safety plan notes that on January 15, 2018, it was discussed with Rachel, that a copy was given to her and she concurred with the plan to take her child away from her. DFCS concedes this never happened.

At the time Beaumier visited with Lott on January 15, 2018, Lott was living with his girlfriend, Amanda Coleman. He had a full time job working at Premium Peanut Production, Inc. in Douglas. He worked a lot of overtime, which placed most of the duty of caring for Brooklynn on the secondary caregiver, Amanda Coleman. DFCS has conceded it was required to examine Lott and Coleman's criminal background and prior DFCS involvement prior to consenting to her role as secondary caregiver. Additionally, Beverly Beaumier was required to initiate drug testing before the child safety plan went into effect. None of this was done.

Coleman had 3 other children under the age of five for whom to care for as well.

Late on January 16, 2018, Beaumier met with Rachel Aldridge for the first and only time. This was in the evening after Rachel had been transferred to the Coffee County Jail. According to both Beaumier and Rachel, Aldridge expected to be released the next day. Beaumier concedes Rachel only consented to have Brooklynn stay with her father for one more evening based upon that premise. Despite this, the child safety plan already in place with Ron Lott / Amanda Coleman never acknowledges this.

The child safety plan under which Brooklynn was placed with her non-legitimated father earlier, directly contradicted her mother's wishes. It provided, if Rachel tried to pick up Brooklynn, law enforcement was to be called to stop this from occurring.

Rachel got out of jail finally on January 22nd, 2018. She walked to pick up her daughter at Ron Lott's. Using the Beaumier child safety plan, which was unsigned by Rachel , Lott refused

Rachel access to her daughter.  This was despite Rachel being Brooklynn's only custodial parent. The safety plan violated Georgia law by placing Brooklynn with her non-legitimated father for a period of up to 45 days.  O.C.G.A. § 19-7-25.

Rachel Aldridge called Raven Johnson, Beaumier's supervisor, to complain about this on January 23, 2018 and was told the Superior Court of Coffee County had granted temporary custody of Brooklynn to Ron Lott and there was no right now for Rachel to have Brooklynn.

The temporary custody petition was:

a.      never served upon Rachel;

b.      Rachel did not known about the hearing;

c.      Ron Lott knew where she was;

d.      the petition was not, in fact, filed until January 26th,  after the ex-parte hearing on January 23, 2018;

e.      the petition, in addition to the order granting temporary custody to Ron Lott, the non-legitimated father of Brooklynn, was not filed untl January 26, 2018.

This petition was based upon demonstrably false pleadings.  In his petition, Ron Lott's attorney pled:

a.      Rachel Aldridge was on meth (false - hair tests proved conclusively not true);

b.      she had no electricity (false);

c.      The Court order prepared by Lott, and Brooklynn's *de facto* counsel Mr. Metts, illegally gave temporary custody of Brooklynn to Ron Lott.  Lott was not the legitimated father of Brooklynn.

Rachel was granted limited access to Brooklynn.  Rachel was the only parent 2 year old

Brooklynn had ever known.

She was now cared for by an admitted meth user, Amanda Coleman.  (On the very day she was murdered, her murderer was trying to score more meth.  She had been continuously using since November of 2017)

At no time was Coleman drug tested.  DFCS has admitted this broke its mandatory policies.  On at least eight separate occasions, either Rachel, her brother-in-law ICE Agent Jimmy Taylor and/or her sister Vanessa Taylor requested of DFCS, Raven Johnson and/or Beverly Beaumier that Coleman and Lott be drug tested.

At no time was a criminal background check done on either Amanda Coleman or Ron Lott.  Had this been done, DFCS has conceded Amanda Coleman never would have been an approved caregiver of Brooklynn.  At the time Coleman was approved by Beverly Beaumier as a secondary caregiver, she, as well as Lott, had pending felony meth charges against them. Coleman had just been arrested for illegal possession of xanax.

If that was not bad enough, she had a prior sanction by DFCS from 2015 for improper treatment of her minor child (Atkinson County).

DFCS has admitted it was mandatory that these checks are required before the child safety plan can be put in place.  As the case manager, these checks were required to be done by Beverly Beaumier and overseen by Raven Golden.

More alarms went off.  On February 11, 2018, Brooklynn Aldridge was noted by her mother to have a large bruise on her leg.  DFCS went out to interview Amanda Coleman, the secondary caregiver.  Coleman denied drug use except for marijuana - which she admitted.  No drug test was performed.  If it had been done, it would have been discovered Coleman was on

8

meth the entire time she took "care" of Brooklynn.

Dr. Patel reportedly looked at the bruising and told DFCS through his office staff he did not see any sign of child abuse.  Brooklynn was taken to her appointment by Coleman, her abuser.  The same large bruise was seen by the Taylors and Rachel, all of whom felt it was a welt delivered by a hit.

Throughout this entire period, Brooklynn was with Coleman and Lott, she was sullen and extremely resistant to go back to Coleman/Lott when she saw her mother for short periods of time on certain Sundays.

On March 6, 2018, Brooklynn Aldridge, an innocent 2 year old girl who did nothing wrong, was bludgeoned to death.  She died from being beaten in the back of the head.

Beverly Beaumier was terminated by DFCS for positive drug tests within three weeks of Brooklynn's murder.

On May 20, 2018, she reached out to Rachel Aldridge in an effort to console her for Brooklynn's beating.  In that facebook message, she conceded DFCS was responsible for the death of Brooklynn.  "I am so sorry for your loss and the failure of the agency to protect Brooklynn"; "You did not fail her, DFCS did".  Beaumier and Raven Golden, her supervisor, were DFCS.

The criminal case of Amanda Coleman proceeded to trial.  She was convicted of the first degree murder of Brooklynn Aldridge on October 31, 2019.

## NON-DISCRETIONARY DUTIES IGNORED

The Defendant's employer, DFCS, has now admitted the defendants in combination violated more than ten non-discretionary duties under DFCS standards.  Most importantly, it has

conceded Amanda Coleman never should have been a caregiver for Brooklynn.  Similarly, Ron Lott, with pending criminal felony meth charges, was precluded from having custody of his non-legitimated daughter.

The non-discretionary duties DFCS concedes were violated by Beaumier are:

a.      Beaumier filled out the child safety plan dated January 15, 2018 without ever talking with Brooklynn's sole custodial parent, Rachel Aldridge;

b.      This child safety plan was given to Ron Lott on January 15, 2018, the non-legitimated father of Brooklynn to keep her mother away from Brooklynn;

c.      The child safety plan for the care of Brooklynn falsely stated Beaumier, the DFCS case manager in charge of this case according to DFCS, had:

1.      Met with Brooklynn's mother on January 15, 2018 to formulate the child safety plan and she agreed on the safety plan;

2.      Rachel Aldridge agreed to the Beaumier formulated safety plan on January 15, 2018; and

3.      Rachel had been given a copy of the child safety plan on that day.

None of this was true and this has been admitted.

d.      The child safety pamphlet required to be given to Rachel, contemporaneous with the entry into the child safety plan, was never given to her nor the contents explained to her.  This pamphlet set out Rachel always retained custody of Brooklynn under the safety plan and could terminate it at will;

e.      The child safety resource consent form was never given to Rachel, gone over with Rachel nor filled out and signed by Rachel.  This was required to be done

10

contemporaneous with the child safety plan;

f.     These documents likewise were never gone over with the "safety resource", Ron

Lott (the same pamphlet and safety resource consent form);

g.     Beverly Beaumier never did a proper background check on the primary safety

resource under the child safety plan (Ron Lott).  This would have shown an

extensive criminal background with pending felony meth possession charges;

h.     A background check should have been done on the secondary safety resource

(Coleman).  This would have shown Coleman had four glaring problems:

1.     Pending felony meth charges;

2.     An arrest for the illegal possession of xanax without a prescription;

3.     Ongoing use of meth, as reported to DFCS by Jimmy and Vanessa Taylor,

and Rachel Aldridge (DFCS was told by Mr. Taylor he could give the

names of the meth suppliers of Coleman to DFCS.  Ms. Aldridge said she

had seen calls to known meth dealers on Coleman's phone when she

borrowed it when she was denied access to Brooklynn).

i.     Given the meth charges pending against them and the multiple complaints about

Lott and the secondary safety resource Amanda Coleman's use of meth, there

should have been drug testing upon each one; this was not done.     Coleman

would have tested positive for meth the entire time.

<u>ARGUMENT AND CITATION TO AUTHORITY</u>

**I.     Plaintiff Is Entitled to Summary Judgment as to the Liability of Defendant
Beaumier for Brooklyn Aldridge's Death Because it Has Been Admitted by Dfcs,
Her Employer, Beaumier Violated Numerous Non-discretionary Duties.  This**

11

**Included Several Non-discretionary Duties Which Would Have Kept Brooklynn's Murderer Totally Away from Her.**

Section 1983 provides, in relevant part:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. The Fourteenth Amendment's Due Process Clause mandates that States not "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. Substantive due process rights are "those rights which the state may not take away," and they include fundamental rights not expressly mentioned in the Constitution. *Taylor v. Ledbetter*, 818 F.2d 791, 794 (11th Cir. 1987) (en banc).

If you look at Beverly Beaumier's involvement with Brooklynn and Rachel Aldridge, more mandatory policies were violated than adhered to.  It is these repeated violations of mandatory duties which led to the death of Brooklynn Aldridge and the clear summary liability of Beverly Beaumier.

A.      **False child safety plan and failure to provide required safety consent form and safety pamphlet set up the events which caused brooklynn's seven weeks of hell without her mom and her bludgeoning death.**

The death of Brooklynn Aldridge grows out of Beverly Beaumier's crafting of a false Child Safety Plan, a failure to advise Rachel Aldridge of her rights under this voluntary plan and, finally, a failure to do mandatory background checks and drug testing before turning a defenseless two year old over to two felons who had no business keeping her.

The guts of this summary judgment were basically set out by DFCS in its 30(b)(6) corporate deposition on July 8, 2021.  LaResa Price, testifying on behalf of DFCS in this case,

confirmed if mandatory, non-discretionary protocols had been followed, Brooklynn never would have been in the custody of either Ron Lott or her tormentor/murderer, Amanda Coleman (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price, Page 105, Lines 13-19).

The reasons Brooklynn should not have been with her murderer as her secondary caregiver evolve around Coleman's existing felony record / charges for meth and xanax abuse and her ongoing meth use from two months prior to her becoming Brooklynn's secondary caregiver through the entire seven weeks she had Brooklynn.

An initial criminal background check should have been done on Coleman.  DFCS admits it was not (See Doc. 76, 30(b)(6) Depo of DFCS, Page 55, Lines 13-24)

Here is what it would have shown:



**AMANDA COLEMAN**

♦ Primary Caregiver for Brooklynn

♦ LONG DRUG HISTORY - 2 FELONY WARRANTS OUTSTANDING (SALE-USE METH)

♦ 2 months before becomes Brooklynn's primary caregiver - indicted meth possession/ pills (xanax)

♦ Trying buy meth night before death of Brooklynn

♦ ADMITS using meth whole time DFCS makes primary caregiver of Brooklynn

♦ DFCS agent testifies - REQUIRED do drug tests / promised to do drug tests - NEVER DO



**RON LOTT**

**AT TIME GIVEN CUSTODY OF BROOKLYNN / ENTIRE TIME CARING FOR HER:**

› **Pending Felony Charges**

  › **Illegal Possession of Meth**
  › **Sale of Meth**

**MATTER OF PUBLIC RECORD ATKINSON COUNTY ('15-'19)**

**LONG HISTORY OF DRUG USE**

As confirmed by DFCS in the deposition of its head of Child Safety, LaResa Price, giving the care of a child to a secondary caregiver where there is a pending felony meth charge and prior DFCS history would not comply with DFCS policy. (See Doc. 76, pp. 81-82). Beyond the failure to do a criminal background check, a drug screening was required here.  Beaumier conceded that in her sworn testimony on May 30, 2019 (See Doc. 82, p. 34). Although Beaumier has refused to participate in a deposition in this case, it is anticipated she will claim these tasks were someone else's job. The problem with that buck-passing is two-fold:

For one, the drug, criminal and prior DFCS history checks are precedent to DFCS to a child safety plan.  DFCS, her employer, has shown this in its testimony and mandatory protocols. Beaumier is estopped to controvert this.Simply put, if Brooklynn would never be entrusted to Amanda Coleman's care as a secondary caregiver on January 15, 2018, she would not have been tormented over the seven weeks leading to her death and then beaten to death on March 6, 2018 by Coleman.  Having broken required protocols meant to protect small, defenseless children - summary judgment on liability is mandated against Beverly Beaumier.

Independently, there are other bases for partial summary judgment against Beverly Beaumier. These arise out of her fraudulent child safety plan. The child safety plan for Brooklynn to stay with her non-legitimated father, Ron Lott, and his live-in girlfriend is a fraud.  The plan states on its face it was discussed with and agreed to by both Rachel Aldridge and Ron Lott.  This plan set everything in motion.  It was used by Lott and Coleman for Brooklynn to stay with her abuser/murderer between January 15th and at least January 26th.

Summary judgment as to liability is mandated because the evidence is uncontradicted had

14

Rachel Aldridge known of her rights to control Brooklynn's placement, she would have chosen from the get-go Jimmy and Vanessa Taylor to keep Brooklynn.

The clear reason this didn't occur is Rachel was never given the safety resource brochure, nor the required child safety form she was required to sign before the child safety plan went into effect.  DFCS concedes both of these acts were required and both did not occur (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price, Page 111, Lines 14-18; Page 112, Lines 2-3).  These documents would have told Rachel she had legal custody of Brooklynn the entire time she was in jail and after she got out on January 22, 2018.

Beaumier has conceded Rachel only wanted Ron Lott to have Brooklynn for one night while she was in jail (See Doc. 82,  Beaumier Depo at Page 22 and 49). She had the right to call from jail and have her daughter placed with Vanessa and Jimmy Taylor, her choice. Therefore, when Rachel walked from jail after she made bond on the later dismissed charges, she had the right to take Brooklynn right away.  This changes the dynamics of the temporary custody petition filed and order granted signed on January 26, 2018.

**B.**     **It has been conceded by DFCS Defendant Beaumier's actions which directly led to Brooklynn's death were not in her discretionary functions.**

Beverly Beaumier was not acting within her discretionary functions when she violated numerous DFCS policies that required her to take actions she did not take. As such, Plaintiff is entitled to summary judgment on Defendant's assertions of qualified immunity. Defendant Beaumier was required to present the child safety plan to the Plaintiff and have her sign a copy for the plan to be fully effective.  (See Doc. 76, 30(b)(6) Depo of DFCS, at 16:10).  However, the signature on the plan is dated before Plaintiff had ever met Defendant or seen the plan. (See Doc.

76, Depo of DFCS, at 19:14-22, 20:7-24, 22:23-24, 23:1-4, 118:8-22, 123:3-25, 130:16-23).

Defendant did not run a general background check on either Ron Lott or Amanda Coleman's

history with DFCS before placing Brooklyn Aldridge with them, despite being required to. (See

Doc. 76, Depo of DFCS, at 25:22-25, 26:1, 27:13-14, 40:15-25, 41:1-9, 99:6-9). In fact, had the

check been done, DFCS admitted that Amanda Coleman would have been precluded from being

an acceptable secondary care giver for Brooklyn. (See Doc. 76, Depo of DFCS, at 105:13-19).

     The Defendants did not conduct any drug screenings before placing Brooklyn with Lott

and Coleman, despite complaints that Coleman was using methamphetamine at the time. (See

Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price at 81:20-25, 82:1-2, 8-18, 86:18-25, 100:21-25,

101:1-9). There was no attempt made to screen Coleman, who would later murder Brooklyn, for

drug use. (See Doc. 76, Depo of DFCS, at 98:19-25, 100:21-25, 101:1-9).

     Further, despite complaints by both Plaintiff and a Federal agent relating to Amanda

Coleman's drug use and potential abuse of Brooklyn, DFCS neglected to respond to these

complaints as mandated. (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price at 32:13-25, 33:1-

4, 21-25, 34:4-8, 54:1-25, 55:1-6, 61:1-9, 62:2-15, 63:11-25, 64:1-24). Defendant even neglected

to make a record of these complaints, blatantly forgoing the requirements of her position in doing

so (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price at 107:13-19). Defendant further failed to

run any criminal background checks as required. ( See Doc. 76, Depo of DFCS, at 55:13-25,

57:1-12). Defendant Beaumier herself further acknowledged that DFCS failed Brooklyn. (See

Doc. 38-24, messages from Beaumier to Rachel Aldridge).

     The power to coordinate a child safety plan for Beverly Beaumier did not include the

ability to ignore and forgo the requirements of her position: to vet the placement of Brooklyn

Aldridge before her placement by DFCS through criminal background checks, drug screenings, and screenings for problems with DFCS in the past.  In looking at the general nature of the Defendant's actions, or omissions here, and "temporarily putting aside the fact that [they] may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances", the failure to take the required actions by Defendant fell outside of her discretionary functions as it was an abrogation of her duties and responsibilities, not an action taken pursuant to them. *See Holloman v. Harland*, 370 F.3d 1252 at 1266.

C.   **Even if these acts fell within the Defendant's discretionary functions, these acts exceeded the Defendant's authority by DFCS's own admission.**

Even assuming arguendo that Defendant was acting pursuant to discretionary functions, she still clearly exceeded her authority in doing so. Employment by a local, county, state, or federal government is not a "carte blanche invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means." *Id.* at 1267. Instead, a government official acts within his discretionary authority if his actions were undertaken pursuant to the performance of his duties and <u>within the scope of his authority</u>. *Mikko v. City of Atlanta*, *Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (emphasis added).

Given that Defendant, by the admission of DFCS, the agency which employed her, acted outside the scope of her authority by failing to:

1) obtain Rachel's valid signature on the child safety plan and present it to her,

2) craft a child safety plan which prohibited the custodial mother from any contact with her child;

17

This is absolutely prohibited under DFCS protocols.  Rachel, under a child safety plan, had custody of Brooklynn.  Here, Beverly Beaumier wrote a child safety plan without consulting the mother who still, under a proper plan, would have custody of Brooklynn.  Beaumier, however, in the plan which she distributes, unilaterally takes custody away from Rachel.

This had concrete effects here which directly led to Brooklynn Aldridge's seven weeks of pre-murder hell and her eventual bludgeoning death.  The "child safety plan" was given to Ron Lott on January 15, 2018.  He used it to keep Rachel from Brooklynn.  The non-discretionary, basically *ultra vires* acts continued by Beverly Beaumier with the failure to:

3) to run a background check (criminal, drug related, and for a history of problems with DFCS) on either Ron Lott or Amanda Coleman, and

4) to respond to or make a record of the complaints regarding Brooklyn's placement and abuse and meth use when required to do so by DFCS policy. By failing to take action that was required of her, Defendant was not acting within the scope of her authority.  This is conceded by DFCS. *See Holloman*, 370 F.3d at 1266; *Mikko*, 857 F.3d at 1144.

LaResa Price, the head of child safety who testified on behalf of DFCS, was especially critical of DFCS' total failure to do drug testing in response to the message it received about Coleman's meth use. DFCS policy required that action be taken in response to the January 24th calls from Rachel Aldridge and Jimmy Taylor related to Coleman's meth use (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price P28, L22-25; P33, L2-4); DFCS did not take immediate action after receiving those calls on January 24th (See Doc. 76, 30(b)(6) Depo of DFCS, LaResa Price P32, L22-24).  As such, Defendant is not entitled to qualified immunity as a matter of law and summary judgment should be rendered for Plaintiff on this issue.

**D.      Even if the Defendant did not exceed her authority, her acts still violated clearly established law.**

Even assuming, arguendo, that Defendant Beaumier was acting within the scope of her discretionary authority, this alone does not entitle her to qualified immunity. *Skrtich v. Thomas*, 280 F.3d 1295, 1303 (11th Cir. 2002). Should the allegations levied against Defendant establish a clear-cut constitutional violation occurred, she does not enjoy qualified immunity. *Hope*, 536 U.S. 730; *West*, 487 U.S. at 48. This is because qualified immunity "shields government officials sued in their individual capacities who act pursuant to discretionary authority 'insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997) (citing *Harlow,* 457 U.S. at 817-818).

On a motion for summary judgment a court is to determine "not only applicable law, but also whether that law was clearly established at the time an action occurred." *Rich*, 841 F.2d at 1563. Courts look to prior appellate decisions to determine whether there is a closely analogous situation decided before the events at issue occurred which makes it clear that the actions taken would violate a person's constitutional rights. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir.2000). These preexisting cases only need to be factually similar, not fingerprint exact. *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003). The actions by Defendant forming the basis of this suit occurred in 2018. Defendant violated clearly established law as of 2018 and so is not entitled to qualified immunity.

Defendant violated the clearly established Fourteenth Amendment rights of Brooklyn Aldridge. In the Eleventh Circuit, it has been clearly established that foster children have a

constitutional right to be free from unnecessary pain and a fundamental right to physical safety

since at least 2004. *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004) (citing *Taylor,* 818 F.2d at

794-95; (see also *Daniel v. Georgia Dep't of Hum. Servs.*, 420 F. Supp. 3d 1350 (N.D. Ga. 2019);

*Omar v. Lindsey*, 243 F. Supp.2d 1339, 1343 (M.D. Fla. 2003), affirmed per curiam, 334 F.3d

1246 (11th Cir. 2003). The state's action in assuming the responsibility of finding and keeping

the child in a safe environment places an obligation on state officials to ensure the continuing

safety of that environment. *Taylor*, 818 F.2d at 794-95. The failure to meet that obligation

constitutes a deprivation of liberty under the fourteenth amendment. *Id.*

Further, it has been clearly established since *Taylor* that "deliberate indifference to the

welfare of a foster child is a violation of federal law actionable under 42 U.S.C. §1983." *Miracle*

*by Miracle v. Spooner*, 978 F. Supp. 1161, 1174 (N.D. Ga. 1997); see also *Daniel*, 420 F. Supp.

at 1357 (Finding that the Eleventh Circuit has explained that "foster care officials" are subject to

liability when they are deliberately indifferent to the violation of a child's right to safety); *Nichols*

*v. Maynard*, 204 F. App'x 826, 828 (11th Cir. 2006) ("Defendants are not entitled to qualified

immunity if they were deliberately indifferent to [the child's] right to physical safety.")

Here, Defendant had actual knowledge of, and was deliberately indifferent to, a

substantial risk of Brooklyn being harmed in the Lott/Coleman home. (See Doc. 76, Depo of

DFCS, at 32:18- 25, 33:1-25, 34:1-9,54:1-25, 55:1-6, 61:1-9, 62:1-15, 63:11-25, 107:13-19). To

show deliberate indifference a Plaintiff must show that Defendant: (1) was objectively aware of a

serious risk of harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more

than merely negligent. *Ray,* 370 F.3d at 1083 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255

(11th Cir. 1999)).

Defendant was made aware of Coleman's drug use and made aware of the profound and unexplained bruise Brooklyn had while at the home. (See Doc. 76, Depo of DFCS, at 30:21-25, 33:1-25, 34:1-8, 47: 14-25, 53:24-25, 54:1-25, 55:1-6, 61:1-25, 62:1-15, 63:18-25, 107:14-19). Despite this knowledge, Defendant failed to even make a record of the complaints she received regarding Coleman's drug use and potential abuse, and she certainly failed to follow up on these complaints to ensure the safety of Brooklyn. (See *Id*.).

Clearly by failing to take the required steps to vet the Lott/Coleman home while Brooklyn was placed there and failing to follow up and record the complaints made of Coleman's drug use and potential abuse of Brooklyn, Defendant was more than merely negligent. Had Beaumier taken the required actions, Brooklyn would not have been placed in the Lott/Coleman home where Coleman was able to beat her to death. Defendant deliberately failed to learn what was occurring in the home despite being actually aware of the harm being posed to Brooklyn, meaning she is not entitled to qualified immunity. *See Maldonado v. Snead*, 168 Fed. Appx. 373, 379 (11th Cir. 2003) (quoting *Taylor*, 818 F.2d at 796).

While Brooklyn was not formally in a foster care situation, the Eleventh Circuit has not squarely held that involuntary committal of a child to state custody is a prerequisite to a child's fundamental right to physical safety or the right to be free from unnecessary harm. *See Smith v. Beasley*, 775 F. Supp 2d. 1344, 1355-56 (M.D. Fla. 2011). The language of several cases suggests that it is not. *See Id*. Further, the *Miracle* court stated that *Taylor* imposes a duty on the state to protect the children in its care "whether [] the parents consent to placement in foster care." 978 F. Supp. at 1174-75. As explained by the District Court it strains belief for the Defendant to claim that, in 1993, reasonable foster care workers believed that they had a greater

21

duty to protect some foster care children from abuse based upon whether the child's parents had voluntarily allowed the state to place the child in the foster care program. The duty is the same, just as the state's duty to a prisoner is the same whether he pleaded guilty or was convicted after a trial. *Id*. at 1175.

The placement of Brooklyn here was clearly involuntary, as Plaintiff did not legitimately sign off on the child safety plan that placed Brooklyn in the Lott/Coleman household. (See Doc. 76, 30(b)(6) Depo of DFCS, at 19:14-22, 20:7-24, 22:23-24, 23:1-4, 118:8-22, 123:3-25, 130:16-23). In fact, Plaintiff wanted Brooklyn to spend one night and one night only with Lott and never agreed he could serve as a safety resource. (See Doc. 38-19, Rachel Aldridge's Affidavit, p. 1-3).

While Brooklyn was not formally in "foster care" at the time she died, this formality is irrelevant to her rights. Children do not need to be placed into foster care for a constitutional duty to arise—it is sufficient if the state affirmatively places the children with a person of the state's choosing and restrains the children's freedom to act on their own behalf. *See DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989); *Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir. 1995); *R.F.J. v. Fla. Dep't of Children & Families*, 398 F. Supp.3d 1268, 1276 (M.D. Fla. 2019); *A.D. v. Ala. Dep't of Human Res*., 995 F. Supp.2d 1253, 1271-72 (N.D. Ala. 2013).

Although Lott and Coleman were not state actors in the same way a licensed foster parent might be, they were nonetheless the "person[s] the state ha[d] chosen" to care for Brooklyn. *Wooten*, 49 F.3d at 699. If state officials affirmatively act to remove children and place them with an individual the state officials have chosen, they cannot avoid their obligation to ensure reasonably safe living conditions simply because the person chosen is not a state-licensed foster

parent. *R.F.J.*, 398 F. Supp.3d at 1276. Plaintiff wanted Brooklyn to go to the Taylors' if she could not have her, and the Taylors were willing to take her. (See Exhibit "E", Plaintiff's Fourth Amended Complaint at p. 2). By choosing someone other than the Taylors or Plaintiff to care for Brooklyn, Defendant Beaumier restricted Brooklyn's freedom and placed upon themselves an obligation to ensure Brooklyn's reasonable safety, which she did not do. *See R.F.J.*, 995 F. Supp.3d at 1278.

It is telling on this point DFCS never took the position in its 30(b)(6) deposition it had no responsibilities to Brooklynn because the Child Safety Plan amounted to a voluntary placement by Rachel with Ron Lott and Amanda Coleman as primary and secondary caregivers. DFCS took the position the Child Safety Plan was basically a non-starter; totally improperly done by Beaumier.

## <u>DEFENSES</u>

Because we have heard it before in justifying the unjustifiable position of Beaumier, the Court should anticipate a number of  "defenses." Throughout, the Court should keep in mind that DFCS did not claim that any of these same defenses were availing in its 30(b)(6) deposition.

<u>Defense #1</u>: Brooklynn was voluntarily placed with Lott. DFCS did not place her there.

<u>Response</u>: (All of these "Defenses" are addressed in more depth *supra*)

The Child Safety Plan used to place Brooklynn with Ron Lott / Amanda Coleman was fraudulent on its face.  It was derived by Beaumier without the <u>required</u> consultation with the caregiver (<u>See Doc. 76</u>, 30(b)(6) Depo of DFCS, LaResa Price, Page 19, Lines 14-22; Page 119, Lines 12-16; Page 130, Lines 13-23). Beaumier unilaterally wrote the Child Safety Plan which illegal gave custody for 45 days to the non-legitimated baby daddy (O.C.G.A. §19-7-25)

<u>Defense #2</u>: Judge Spivey gave temporary custody to Ron Lott on January 23, 2018. DFCS was no longer responsible after that. Amazingly, this has repeatedly been Defendants' position. In essence, don't blame us, we were off duty.

<u>Response</u>: In Defendant Beaumier's Motion to Dismiss it is asserted that the Rule Nisi order awarding Ron Lott custody of Brooklyn Aldridge and the hearing that followed constitute intervening acts that break the causal chain and superseded any grant of custody under the safety plan. (See Doc. 33-1, pp. 21, 24). However, the grant of temporary custody to Ron Lott was invalid as custody of Brooklyn was awarded to Lott before he was legitimated as her father and notice was not given to Rachel Aldridge nor was Rachel afforded an opportunity to be heard.

In Georgia, "only the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child as provided in Code Section 19-7-22. Otherwise, the mother may exercise all parental power over the child." O.C.G.A. § 19-7-25; *see also Allen v. State*, 284 Ga. 310, 313 (2008); *Gregg v. Barnes*, 203 Ga. App. 549, 543 (1992) (pre-legitimation only the mother may exercise all parental power over the child). O.C.G.A. § 19-7-22 provides the exclusive procedure for legitimizing children in Georgia. *See Savage v. Blanks*, 117 Ga. App. 316, 316 (1968) (applying Code § 74 -103, predecessor statute to O.C.G.A. § 19-7-22). While subsection (g) of O.C.G.A. § 19-7-22 provides that legitimation petitions may include claims for custody and visitation, only the mother is entitled to custody until the legitimation is "properly entered." *Ernst v. Snow*, 305 Ga. App. 194, 198 (2010); *also see Braynon v. Hilbert*, 275 Ga. App. 511, 512 (2005); *Pruitt v. Lindsey*, 261 Ga. 540, 542 (1991).

Given this, if the purported father asks for custody in his legitimation petition, the court can award custody concurrently with the grant of his legitimation petition, but it cannot award

24

custody or visitation before granting the legitimation. *See e.g. Chalk v. Poletto*, 346 Ga. App.

491, 496 (2018); *Branyon*, 275 Ga. App. at 512; *Smith v. Pearce*, 334 Ga. App. 84, 88 (2015);

*Ernst*, 305 Ga. App. at 198. The Defendant cannot reasonably claim to use the Rule Nisi as a

shield to her liability as "citizens are presumed to know the law, and ignorance of the law

excuses no one." *Harris v. State,* 324 Ga. App. 411, 414 (2013).

<u>CONCLUSION</u>

Accordingly, Plaintiff respectfully asks that this Court GRANT summary judgment in her

favor on the issue of  Defendant Beaumier's liability.

Respectfully submitted this 13th day of October, 2021.

<div align="right">

**/s/ Brent J. Savage**
Brent J. Savage
Georgia Bar No. 627450
*Attorney for Plaintiff*

</div>

SAVAGE, TURNER, PINCKNEY & SAVAGE
P.O. Box 10600
Savannah, Georgia 31412
(912) 231-1140
lhatcher@savagelawfirm.net

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a true and correct copy of the above and

foregoing **Plaintiff's Motion for Partial Summary Judgment and Brief in Support Thereof**

by using the CM/ECF system which will send an electronic copy to the following counsel of

record:

<div style="display:flex">

Paul Henefeld
Noah Green
Appelbaum Henefeld & Green, P.C.
9 Lenox Pointe, N.E., Suite B
Atlanta, GA 30324
pah@aps-law.com
ng@aps-law.com

Leslie Kennerly
J. Holder Smith
Young, Thagard, Hoffman, LLP
P.O. Box 3007
Valdosta, GA 31604
lesliekennerly@youngthagard.com
jaysmith@youngthagard.com

</div>

Laura Lones
Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334-1300
llones@law.ga.gov

This 13th day of Octoberr, 2021.

**/s/ Brent J. Savage**
Brent J. Savage
Georgia Bar No. 627450
*Attorney for Plaintiff*

SAVAGE, TURNER, PINCKNEY & SAVAGE
P.O. Box 10600
Savannah, Georgia 31412
(912) 231-1140
lhatcher@savagelawfirm.net
bsavage@savagelawfirm.net