EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COFFEE COUNTY, GEORGIA
**SUS2019000633**
NOV 21, 2019 03:35 PM

*Elisa Gillis*
Elisa Gillis, Clerk
Coffee County, Georgia

IN THE SUPERIOR COURT OF COFFEE COUNTY
STATE OF GEORGIA

RACHEL ALDRIDGE, as Surviving Mother of BROOKLYNN ALDRIDGE, Deceased,

  Plaintiff,

-vs-

GEORGIA DEPARTMENT OF HUMAN SERVICES, and the GEORGIA DIVISION OF FAMILY AND CHILDREN SERVICES, DISTRICT 11,

  Defendant.

CIVIL ACTION NO:

## COMPLAINT

COMES NOW, RACHEL ALDRIDGE, Plaintiff in the above referenced action, and brings this her Complaint for Damages, showing as follows:

### PARTIES, JURISDICTION AND VENUE

1. RACHEL ALDRIDGE ("Plaintiff") was the Natural Mother and Parent of Brooklynn Aldridge, Deceased Minor. At the time of her death, BROOKLYNN ALDRIDGE was a Minor.

2. Plaintiff is a proper party to bring this action for the Wrongful Death of her Minor Child.

3. Defendant GEORGIA DEPARTMENT OF HUMAN SERVICES (hereinafter "DHS") is an agency of the State of Georgia, created by virtue of state law to administer all categories of public assistance.

4. The GEORGIA DIVISION OF FAMILY AND CHILDREN SERVICES ("DFCS") is a division of the DHS.

5. District 11 of the Georgia DFCS is a division and instrumentality of the DHS, and serves both Pierce and Coffee County.

6. The DHS is liable for the torts of District 11 DFCS.

7. The DHS may be served with process through its Commissioner, Robyn A. Crittenden, at 2 Peachtree Street, NW, Suite 29-210 Atlanta, Georgia 30303. Process shall also be served upon Wade Damron, Director of Risk Management Services, Georgia Dept. of Administrative Services, located at 200 Piedmont Avenue SE, Suite 1208, West Tower, Atlanta, Georgia 30334.

8. DFCS may be served by and through its Director, Tom C. Rawlings.

9. DFCS District 11 may be served by and through Amy Yawn, Director, Pierce County DFCS Office, at 621 Hendry Street, Blackshear, Georgia 31516.

10. DFCS District 11 may also be served by and through Kelly Harmon, Director, Coffee County DFCS, at 1300 West Baker Highway, Douglas, Georgia 31534.

11. Attached hereto as Exhibit "A" is a certificate confirming that a copy of this Complaint, showing the date of filing, shall be mailed to the Attorney General at his usual office address, by certified mail or statutory overnight delivery, return receipt requested.

12. Prior to the filing of this Complaint, on or about January 15, 2019, Plaintiff served a notice of claim upon Wade Damron, Director of Risk Management Services for the State of Georgia and Tom C. Rawlings, the Interim Director of the Division of Family and Children Services. (A copy of this notice of claim, as well as documents evincing receipt of this notice by the addressees, are attached hereto as Exhibit "B.").

13. In addition, and prior to the filing of this Complaint, on or around February 27, 2019, a notice of claim was served upon Tom C. Rawlings, Interim Director of the Division of Family and Childrens Services, Robyn A. Crittendon, Commissioner of the Georgia Department of Human Services, and Tonya Cureton Curry, General Counsel of the Georgia Department of Human Services, and Wade Damron, Director of Risk Management Services, each by hand delivery. (A copy of this notice of claim, as well as documents evincing receipt of this notice by the addressees, are attached hereto as Exhibit "C.")

14. Venue is proper in this court as the tort giving rise to the Plaintiff's claims occurred in this county. O.C.G.A. § 50-21-28.

## FACTS GIVING RISE TO PLAINTIFF'S COMPLAINT

15. Plaintiff's decedent, Brooklynn Aldridge (hereinafter "Brooklyn" or "the Child"), was born on January 4, 2016. The Child's natural father is Ronald Lott, Jr. (hereinafter "Lott"). Lott did not initiate efforts to legitimize the child until January of 2018.

16. Between the Child's birth and January of 2018, Lott had little or nothing to do with the Child, and provided little to no meaningful financial support.

17. On or about January 14, 2018, Pierce County, Georgia police arrested Rachel Aldridge for failing to appear at a court hearing addressing charges of assault on a different case. Plaintiff was taken to the Pierce County jail. These charges were later dismissed as spurious.

18. At this time, Brooklynn was not in the Plaintiff's home, but was instead at Lott's home. Plaintiff, believing she would be released the following day, agreed that Brooklynn could remain at Lott's home for the night.

19. Local police initially allowed Plaintiffs' other children to remain in her home, under the supervision of a friend. Within a short time, Plaintiff's sister, Vanessa Taylor, took two of Plaintiff's remaining children to her home. Vanessa Taylor, and her husband Jimmy, had worked as foster parents, and able to provide safe and appropriate care to children in need. The Taylors, the Child's blood relatives, were well-qualified and trained to provide temporary care and safety for Brooklynn.

20. Subsequently, on or around January 15 or 16 of 2018, Plaintiff was transferred to the Coffee County jail.

21. While in the Coffee County jail, Plaintiff first met with Beverly Beaumier of the Pearson/Bacon County DFCS. Ms. Beaumier presented Plaintiff with three separate safety plans, addressing placement of four of her children.

22. Plaintiff never signed a safety plan which addressed temporary placement of Brooklynn with Lott, where he would keep Brooklynn to the exclusion of Rachel Aldridge. Nevertheless, Beaumier prepared a "Safety Plan" allowing placement of Brooklynn, which included the following provisions:

    a. that Lott "will provide care/supervision for child Brooklynn pending investigation by agency" and further indicates that Lott will provide medical care for the Child.

    b. that Lott "agrees to contact agency if Rachel Aldridge attempts to remove Brooklynn form his care/home."

(A copy of this "Safety Plan" is attached hereto as Exhibit D).

23. The "Safety Plan" falsely states that Plaintiff consented to this plan. In truth and in fact, Rachel Aldridge did not consent. This document was altered to make it appear as if Plaintiff did consent.

24. Plaintiff did not consent to Lott having prolonged custody of Brooklynn, and believed she would regain custody of Brooklynn immediately upon her release from jail. At this time, Plaintiff believed that she would spend only one to two nights in jail.

25. Plaintiff was not released from the Coffee County jail until on or around January 22, 2018.

26. Upon her release, Plaintiff immediately went to Lott's home to retrieve Brooklynn. Upon arriving at Lott's home, Lott presented her with the false "Safety Plan," which purported to allow Lott to retain physical custody of Brooklynn. Lott threatened to contact law enforcement if Plaintiff insisted on taking Brooklynn.

27. At this time, Amanda Coleman was living with Lott.

28. Ms. Coleman was known to be a meth user, and it was also known that she used meth with Ron Lott.

29. Lott also had a history of drug abuse, as well as a history of criminal conviction for methamphetamines.

30. While at Lott's home on January 22, 2018, Plaintiff borrowed Ms. Coleman's phone, and observed that Coleman's recent contacts were known to use drugs. This information caused Plaintiff alarm and fear for her daughter's safety.

31. Unbeknownst to Plaintiff, Lott initiated legitimation proceedings and obtained an *ex parte* order from the Superior Court of Pierce County on January 23, 2018, giving

him temporary custody of Brooklynn. Neither the legitimation proceeding nor the *ex parte* order were actually filed with the Clerk of Court until January 26, 2018.

32. This *ex parte* order also allowed Plaintiff to exercise supervised visitation Lott's home, every Sunday from 2:00 to 4:00 p.m., and further set a hearing in the matter to be held on March 1, 2018.

33. At the time of the procurement of the *ex parte* order, representatives of the Defendant and Mr. Lott knew where the Plaintiff was and could have easily contacted her prior to seeking an *ex parte* order from the Court.

34. In support of his Petition for Legitimation, Lott provided the Court with a copy of the false Safety Plan, which purportedly evinced both Plaintiff's consent to Mr. Lott having temporary custody, and her agreement that Lott could contact law enforcement if Plaintiff tried to retrieve her daughter. This plan had been provided to Mr. Lott by a representative of DFCS who suggested Ms. Aldridge was on methamphetamine and therefor Lott needed to seek custody of Brooklynn. This statement was absolutely false.

35. The Superior Court relied on this false document in awarding Lott temporary custody of Brooklynn.

36. On or around January 23, 2018, Plaintiff made several unsuccessful attempts to contact Beaumier. Plaintiff then contacted Beaumier's supervisor, Raven Johnson. Ms. Johnson initially informed Plaintiff that Lott had no rights to the Child, and that

Plaintiff could retrieve Brooklynn from Lott. However, moments later, Johnson provided Plaintiff with a copy of the *ex parte* order awarding temporary custody to Lott.

37. At this point, Plaintiff was extremely distressed and informed Johnson that Lott's "live in" girlfriend, Amanda Coleman, was using drugs. Neither Johnson nor any other DFCS representative took any action to investigate this information, or to further evaluate the propriety of Brooklynn's placement. Brooklynn was allowed to remain in the Lott home, with known drug user Amanda Coleman.

38. Plaintiff requested that Brooklynn be placed in the care of her sister and brother-in-law. This request was ignored.

39. On January 24, 2018, Plaintiffs sister contacted Beverly Beaumier regarding Plaintiff's ability to resume custody of her children. At this time, Beaumier informed Plaintiff's sister that Lott had "temporary custody" of Brooklynn, and that Brooklynn would remain in Lott's care. Beaumier also represented that "everyone will receive drug screens." Incredibly, Coleman did not undergo a drug screen at this time or at any time before Brooklynn's death.

40. Raven Johnson advised Plaintiff that in order to regain custody of Brooklynn, she needed to enroll in a substance abuse rehabilitation program for at least thirty days. Despite the fact that Plaintiff was not in need of such services at the time, and in a desperate attempt to regain custody of Brooklynn, Plaintiff voluntarily enrolled in a

residential substance abuse rehabilitation facility, known as Still Water, on January 25, 2018. Drug screens performed on Plaintiff during her enrollment were all negative.

41. Plaintiff was allowed to leave the Still Water facility for employment and to exercise visitation with Brooklynn.

42. On February 5, 2018, Plaintiff began employment at Fleetwood Homes in Douglas, Georgia. Her file from Fleetwood Homes includes a letter dated February 23, 2018, stating she had been doing an excellent job, was to be promoted, and had "proven herself to be efficient and punctual," and that Plaintiff shows outstanding performance in everything she does."

43. On February 11, 2018, Plaintiff exercised her Sunday visitation with Brooklynn at the Lott residence. During this visit, Plaintiff observed a large bruise on the back of Brooklynn's right thigh. Plaintiff called DFCS and informed them of this bruise, and reiterated her concerns that her child's safety was in great danger in the Lott home. Plaintiff in fact told the DFCS representative that her daughter was in danger and would die if left in the care of Lott and Coleman. This unfortunately proved all too true.

44. On that same day, DFCS received notification from another source that Brooklynn was injured, and that Amanda Coleman was a using meth and THC. Beverly Beaumier was also notified of this abuse. Despite the evidence of physical abuse and drug use in the Lott home, DFCS allowed Brooklynn to remain in that house.

- 9 -

45. Upon receipt of this information, DFCS was required to initiate and perform a safety screening into the background of Coleman and Lott.

46. Had such a screening been performed, DFCS would have learned that Coleman had a substantiated allegation of child endangerment, from May of 2015, related to her confirmed use of opiates, amphetamines, and marijuana.

47. Had such a screening been performed, DFCS would have learned that Ron Lott had a 2014 criminal conviction for possession of methamphetamine, which was ultimately resolved through a "first offender" plea; and a 2015 charge for possession of methamphetamine and of a controlled substance, which was "nolle prossed."

48. As a result of DFCS' failure to conduct the required screening of Coleman, the Child was allowed to remain in the Lott household, under the care of Coleman.

49. On February 12, 2018, DFCS/CPS Case Manager Branch visited the Lott home. In an interview, Coleman admitted to the Case Manager that she had used THC about a month prior. Still, despite this admission and claims from others that Coleman was using dangerous drugs, DFCS did not order drug testing for Coleman. The only cautioning or instructions given to Coleman was that it was okay to continue to smoke dope – just not around children.

50. Again, Plaintiff complained to DFCS about Brooklynn's placement in the Lott home, and expressly stated that her daughter was not safe in a home under the supervision of Coleman and Lott (who had a known history of drug use and abuse). Again, Plaintiff

requested that Brooklynn be placed under the care of her sister and brother in law. This request was ignored.

51. On March 1, 2018, the Legitimation Proceedings came before the Superior Court of Pierce County, Georgia, for a temporary hearing. Lott was represented by an attorney. The Plaintiff was not. Unrepresented, intimidated by the process, unarmed with the results of any investigative action, or results of any investigation into either Coleman's or Lott's background, or safety plans prepared by DFCS, and afraid that the Court would deny her any access to Brooklynn, Plaintiff begrudgingly acceded to a temporary custody arrangement, where she and Lott would alternate weeks of custody.

52. Plaintiff exercised visitation with Brooklynn on March 3 and March 4. Plaintiff returned Brooklynn to the Lott home on the afternoon of Sunday, March 4. This is the last time that Plaintiff would see her daughter alive.

53. On March 6, 2018, while under the negligent care and supervision of Amanda Coleman, it is believed that Brooklynn fell and sustained blunt force trauma to her head. After sustaining this injury, the Child was placed in a bedroom, and left unsupervised. The Child vomited, and aspirated the vomit, and subsequently died. The death of the Child was caused by the negligent care and supervision of Amanda Coleman.

54. Drug testing performed on Amanda Coleman after the Child's death indicate the high and likely probability that Coleman was under the influence of methamphetamines at the time she was to be supervising and caring for the Child.

55. Results of drug tests performed on Lott received after the Child's death were positive for methamphetamines. (A hair sample was collected near in time to the Child's death which tested positive for methamphetamines, as well as a urine screen).

56. In these circumstances, and upon notification of drug use of Coleman and observable bruising to the Child, policies and procedures in place governing the DHS, DFCS, the DFCS regional office for Region 11 (serving Pierce County, Blackshear and Patterson Georgia) as well as the DFCS Regional office for Region 11 (serving Coffee County, Ambrose, Broxton, Douglas and Nichols) **required** DFCS personnel:

    a. to alert local law enforcement that a minor child was in danger as a result of the criminal conduct (drug use) of the adults who had custody of her so that police could properly investigate and address the concerns and protect Brooklynn Aldridge from harm related to the drug use;

    b. to conduct drug screen or test of Ron Lott and Amanda Coleman;

    c. to conduct a safety screening on Ron Lott and Amanda Coleman, which would include an evaluation of their history with Child Protective Services;

    d. to timely and immediately prepare a Safety Plan, identifying ad addressing safety threats to the Child; and

    e. to take all actions necessary to protect Brooklynn Aldridge up to and including removing her from the custody of Amanda Coleman,

including disqualification of any prospective caregiver with positive drug screens for illegal drugs or who refuses to consent to a drug screen. Had proper screening been performed, disqualification of Amanda Coleman as a caregiver was required.

57. DHS, acting by and through DFCS, had no discretion in these matters.

58. DHS, acting by and through DFCS Region 11, failed to follow these mandatory policies. This failure caused the death of the Child.

59. In the aftermath of Brooklynn's death, Amanda Coleman admitted to DFCS she had been using meth during the time she was Brooklynn's primary care giver. Given this and her positive drug tests, all children under her care were removed from her custody. Unfortunately, it was too late for Brooklynn.

60. As a direct and proximate result of all of the Defendants' foregoing tortious acts and omissions constituting a complete dereliction of the duties imposed by Defendants' own policies and procedures, Brooklynn Aldridge suffered injuries, illness, pain, suffering, fear, shock, worry, anxiety and ultimately death thereby entitling Plaintiff to an award of damages.

## CAUSES OF ACTION

### COUNT ONE:
### NEGLIGENCE

61. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 60 as if fully set forth herein.

62. Beverly Beaumier, an employee of DHS/DFCS District 11, prepared a "Safety Plan" which erroneously stated that Plaintiff 1) consented to the Child's Placement with Lott, and 2) agreed that she could not retrieve the Child, and that if she did, Lott would contact DFCS or law enforcement. Ms. Beaumier has admitted under oath the Child Placement plan submitted by DFCS as agreed to by Rachel Aldridge was not consented to by Ms. Aldridge (See Exhibit "D").

63. Defendants Georgia Department of Human Services, DFCS, and their employees were negligent in submitting the Georgia Safety Plan which falsely represented that Rachel Aldridge, caregiver for Brooklynn Aldridge, agreed with the plan which violated Defendants' policies and protocols.

64. Plaintiff did not agree to any of these provisions, and did not sign this Safety Plan. The document falsely states that Aldridge "agrees with plan." Preparation of a false document is not authorized by DHS/DFCS policies, protocols, or procedures.

65. This false information allowed Lott to obtain temporary custody of the Child, as it was presented to the Superior Court in an *ex parte* proceeding. Lott used this false information to intimidate Plaintiff and to prevent Plaintiff from retrieving her daughter

upon her release from the Coffee County jail. This false document was instrumental in Lott obtaining temporary custody of the Child, even though he had not yet legitimated her. This false Safety Plan was a critical factor in allowing the Child to remain in the Lott home, even though Mr. Lott had no legal relationship to the Child. This false document is proximally related to the death of the Child.

### COUNT TWO:
### NEGLIGENCE

66. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 as if fully set forth herein.

67. On January 23, 2018, Plaintiff informed DFCS of drug use by Amanda Coleman.

68. DFCS policy and procedure required that a drug test of Amanda Coleman, as a care giver of the Child, be immediately investigated, and that a drug test be performed. This policy is mandatory, and does not allow DFCS personnel any discretion in the decision to investigate the allegations or to require drug screening. An investigation must be performed, and a drug screen must be performed.

69. DFCS policy and procedure also required that a proper safety screening be performed on both Lott and Coleman. No such screening was performed, and critical information regarding Coleman's history of drug related harm to children in her care was

not discovered. This information required disqualification of Coleman as a caregiver. This policy is mandatory, and does not allow DFCS personnel any discretion.

70. DFCS policy further requires that a Safety Plan be implemented to protect the Child upon reports of drug use. No such Safety Plan was created or implemented after DFCS received reports of Coleman's drug use.

71. No such action was taken to investigate the allegations or to conduct a drug screen of Amanda Coleman. Had such an investigation or drug screen been conducted, Coleman's known drug use would have been confirmed, and either the Child removed from the Lott Home, or Amanda Coleman removed from the home. Neither occurred. Coleman's supervision and care for the Child continued, culminating in the death of the Child, as herein alleged.

72. Upon receipt of this information, Defendants Georgia Department of Human Services, DFCS and their employees were negligent in their failure to record, document, investigate, address, to develop a plan or take any other action with respect to the reports that Brooklynn Aldridge was in danger as required under Defendants' policies and procedures.

### COUNT THREE: NEGLIGENCE

73. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 72 as if fully set forth herein.

74. On February 11, 2018, Plaintiff again informed DFCS of drug use by Amanda Coleman. On this date, DFCS also received a report that the Child was being abused in the Lott home. DFCS policy and procedure mandated that upon receipt of this information, Amanda Coleman undergo a drug screen. This policy does not allow DFCS personnel any discretion in the decision to investigate the allegations or to require drug screen. An investigation must be performed, and a drug screen must be performed.

75. DFCS policy further requires that a Safety Plan be implemented to protect the Child upon reports of drug use and physical abuse. No such Safety Plan was created or implemented after DFCS received reports of Coleman's drug use and physical abuse to the child.

76. Despite these serious allegations, no efforts were made to conduct a drug screen of Amanda Coleman. Had such efforts been taken, the results of the screen would have disqualified Amanda Coleman as a caregiver. In the alternative, if Amanda Coleman had refused the drug screen, her refusal would have also required her disqualification as a caregiver, and the Child removed from her care.

77. The failure of DFCS to follow its mandatory policies allowed the Child to remain under the care of Amanda Coleman, leading to her death, as hereintofor plead. Upon receipt of this information, Defendants Georgia Department of Human Services, DFCS and their employees were negligent in their failure to record, document, investigate, address, to develop a plan or take any other action with respect to the reports

that Brooklynn Aldridge was in danger as required under Defendants' policies and procedures.

## IV.

## DAMAGES

78. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 77 as if fully set forth herein.

79. Each of the foregoing acts and omissions were the proximate cause of the Child's injuries and death.

80. Plaintiff Rachel Aldridge, as Surviving Parent of Brooklynn Aldridge, Deceased, is entitled to recover for the full value of the life of Brooklynn Aldridge, for her wrongful death, and all other elements of damages allowed under Georgia law.

81. Defendants have acted in bad faith, have been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expense and, accordingly, is liable to Plaintiff for attorney's fees and costs of litigation, pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE, Plaintiff prays:**

(A) That Summons and Process be issued and served upon Defendants;

(B) For a trial by a jury comprised of twelve persons;

(C) That Plaintiff be awarded general damages for Brooklynn Aldridge's pain and suffering in an amount to be determined by the enlightened conscious of fair and impartial jurors;

(D) That Plaintiff be awarded damages for the wrongful death of Brooklynn Aldridge in an amount to be determined according to the full economic and non-economic value of the life of the deceased;

(E) That Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury and as permitted under Georgia law;

(F) Plaintiff be awarded all funeral expenses in an amount to be proven through the evidence at the time of trial;

(G) For recovery of attorney's fees and all costs of litigation against Defendant; and

(H) That Plaintiff recover such other and further relief as this Court deems just and proper.


THIS THE 21st DAY OF NOVEMBER, 2019.


SAVAGE & TURNER, P.C.


By: /s/ Brent J. Savage
Brent J. Savage
Georgia Bar No. 627450


102 East Liberty Street, 8th Floor
Post Office Box 10600
Savannah Georgia 31412
Phone: (912) 231-1140
Fax: (912) 232-4212
lhatcher@savagelawfirm.net